# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

UNITED SPINAL ASSOCIATION;
FAITH OLIVIA KELLER; KIMBERLY
HARRISON; LINDA GITCHELL; and
LAURA ABBOTT dba LAURA J.
ARTISTRY,

       Plaintiffs

v.

FLORIDA DEPARTMENT OF
HIGHWAY SAFETY AND MOTOR
VEHICLES and DAVE KERNER, in his
official capacity as Executive Director of
the Florida Department of Highway
Safety and Motor Vehicles

       Defendants.

_____/

Case No: 4:25-cv-00450-AW-MAF

## CONSENTED[1] SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, UNITED SPINAL ASSOCIATION; FAITH OLIVIA KELLER;

KIMBERLY HARRISON; LINDA GITCHELL; and LAURA ABBOTT dba

LAURA J. ARTISTRY, by and through their undersigned counsel, sue the

---

[1] Pursuant to Rule 15(a)(2), this Second Amended Complaint is filed with the written consent of Defendants.

Defendants, FLORIDA DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, and DAVE KERNER, in his official capacity as Executive Director of the Florida Department of Highway Safety and Motor Vehicles (collectively "Defendants") and states as follows:

## JURISDICTIONAL ALLEGATIONS

1) The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 for the Plaintiffs' claims under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*., and its implementing regulations at 28 C.F.R. Part 35 (hereinafter the "ADA").

2) Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring within this judicial district.

3) Plaintiff United Spinal Association ("United Spinal") is a national 501(c)(3) nonprofit membership organization that was founded by paralyzed veterans in 1946. Plaintiff United Spinal has members who are qualified to participate in and benefit from the programs and services of the State of Florida.

4) Plaintiff Faith Olivia Keller is an individual with disabilities residing in Leon County, Florida, and is *sui juris*. She is qualified to participate in and benefit from the programs and services of the State of Florida.

5) Plaintiff Kimberly Harrison is an individual with disabilities residing in St. Johns County, Florida, and is *sui juris*. She is qualified to participate in and benefit from the programs and services of the State of Florida.

6) Plaintiff Linda Gitchell is an individual with disabilities residing in Pasco County, Florida, and is *sui juris*. She is qualified to participate in and benefit from the programs and services of the State of Florida.

7) Plaintiff Laura Abbott *dba* Laura J. Artistry is an individual and small business owner who has relationship with her customers with disabilities who need accessible parking spaces. She resides in Leon County, Florida and is *sui juris*.

8) Defendant, Florida Department of Highway Safety and Motor Vehicles ("FLHSMV"), is a public entity within the meaning of 42 U.S.C. § 12131(1).

9) Defendant, Dave Kerner is the Executive Director of the FLHSMV and is sued in his official capacity for injunctive and declaratory relief. Kerner, in his official capacity, is responsible for FLHSMV's actions or omissions to act. Collectively, Dave Kerner and the FLHSMV will be referred to as FLHSMV or Defendants.

**GENERAL ALLEGATIONS**

10) The Americans with Disabilities Act (ADA) is the law of the land. U.S. Const. art. VI, cl. 2. The ADA requires that parking areas have a certain number of

3

accessible disability parking spaces for people with disabilities. 42 U.S.C. §§ 12131-12134, 12182-12186; 28 C.F.R. §§ 35.150, 151, 36.304, 36.401 *et seq.*; 2010 ADA Standards for Accessible Design, Sections 206, 208, 502; *see also* 2004 ADA Accessibility Guidelines (ADAAG), 36 CFR part 1191, apps. B & D (2009); 1991 ADA Standards for Accessible Design, 28 CFR part 36 app. D; Uniform Federal Accessibility Standards (UFAS), 41 CFR part 101-19.6, app. A.

11) An accessible disability parking space is designed to be safe and useable for people with mobility disabilities. It must be flat, wide, and near a short accessible path to the entrance. It must have a striped area called an access aisle. The access aisle gives the disabled person room to get their wheelchair or other mobility devices out and then safely exit the car and navigate to the accessible path. The access aisle gives room for a person to transfer from their car into their wheelchair. ADA Standards for Accessible Design, Section 502.

12) The required number depends upon the size of the parking area. The total required is about 2 to 4% of all parking spaces. Some places like hospitals and rehabilitation centers must have more disability parking spaces. Hospitals must have 10% and rehabilitation centers must have 20%. At least one out of six accessible disability parking spaces must be designed for vans. 2010 ADA Standards for Accessible Design, Section 208. A van-accessible disability

parking space is wider and gives enough room for the disabled person to use a ramp or lift to exit the vehicle. People who need a wide area to get their mobility equipment out and then exit their vehicles use van spaces.

13) There are not enough accessible disability parking spaces for people with disabilities who need them. Most people with disabilities who need accessible disability parking spaces report that they cannot park in their communities. More than half say they have skipped a trip because they worried they could not find parking. *See* Accessible Parking Coalition, 2018 Report: National Survey on Accessible Parking and Disabled Placard Abuse.

14) Policymakers wrote the first 2 to 4% rule about 50 years ago. There are now many more people with disabilities in the community. In Florida, based on public records, there are almost 20 disability permits for every 100 registered cars. This means that accessible parking spots should be about 15 to 20% of all parking spaces to include Floridians with disabilities.

15) Under federal law, accessible disability parking spaces are reserved for people with disabilities. 28 C.F.R. Part 35, App. A; 75 Fed. Reg. 56164, 56201 (2010); 100 P.L. 641, 102 Stat. 3335 (1988), § 3; 23 U.S.C. § 402 notes; 23 C.F.R. Part 1235.

16) Every state has a system for granting disability parking permits to disabled people who show they are eligible. Every state requires a licensed clinician to

5

certify a significant mobility disability. Some states, including Florida, give parking permits to people with other disabilities like blindness.

17) Every state, including Florida, has a system for punishing the unlawful use of accessible disability parking spaces through fines, towing, and in some cases criminal penalties.

18) Defendant FLHSMV is the agency responsible for administering the disabled persons parking permit program for the State of Florida. *See* Fla. Stat. § 320.0848. Under Florida law, the certification of disability to obtain a long-term or temporary disability parking permit must be completed by a licensed clinician. Fla. Stat. § 320.0848(1)(b)(2.), (3)(b). The certificate of disability must include this statement in bold: **"A disabled parking permit may be issued only for a medical necessity that severely affects mobility."** Fla. Stat. § 320.0848(1)(c).

19) Under Florida law, it is unlawful for anyone to park in an accessible disability parking space unless they have a disability parking permit displayed and the vehicle is transporting the disabled person to whom the permit was issued. Fla. Stat. § 316.1955. A law enforcement officer or parking enforcement specialist may charge the violator with a traffic citation, punishable by a fine of at least $100 and up to $250. Fla. Stat. §§ 316.1955(1)(b); 316.008(4); 318.18(6). A violator who refuses to show a law enforcement officer or

parking enforcement specialist their disability parking permit or state-issued identification upon request may be charged with a first-degree misdemeanor, punishable by up to one year in prison and/or a fine of up to $1,000. Fla. Stat. §§ 316.1955(1)(d), 775.082(4)(a), 775.083(1)(d). A law enforcement officer, parking enforcement specialist, or the owner or lessee of the space may have the vehicle towed. Fla. Stat. § 316.1955(1)(a).

20) Under Florida law, it is unlawful for anyone to park in an accessible disability parking space with a fraudulently obtained permit, a disabled person's permit (when the disabled person is not being transported), or an unauthorized replica of a permit. Fla. Stat. § 320.0848(7). Violators may be charged with a second-degree misdemeanor, punishable by up to sixty days in prison and/or a fine of up to $500. Fla. Stat. §§ 320.0848(7), 775.082(4)(b), 775.083(1)(e).

21) In 2025, Florida passed a law that allows anyone who is pregnant to get an Expectant Mother Parking Permit. 2025 Fla. SB 462 (adding Fla. Stat. § 320.0849) (signed by the Governor on June 19, 2025, and effective July 1, 2025). According to this Florida law, a person with an Expectant Mother Parking Permit can lawfully park in an accessible disability parking space. The permit lasts for one year from the date of issuance. Fla. Stat. § 320.0849.

22) The only requirement for the Expectant Mother Parking Permit is that the physician certify that the applicant is diagnosed as an expectant mother, or

pregnant. There is no requirement that the applicant show any mobility impairment or other disability. Application for Expectant Mother Parking Permit, https://www.flhsmv.gov/pdf/forms/83040.pdf.[2]

23) From June 1, 2025, to January 31, 2026, FLHSMV issued more than 10,000 Expectant Mother Parking Permits. This number is expected to rise. Policymakers, health care professionals, and social media accounts are widely sharing information about how to get the pregnancy permits. Based on available data, more than 250,000 Floridian are eligible for this permit over any year.[3]

24) Section 320.0849 conflicts with the ADA and is causing injuries:

   a. Floridians with disabilities like Plaintiffs Keller and Harrison who need accessible disability parking spaces are being harmed and face a likelihood of future harms. They can no longer rely on the State of Florida to make sure that accessible disability parking spaces are

---

[2] During legislative proceedings, bill sponsor Representative Fiona McFarland stated, "[P]regnancy is not a disability. I just want to be able to park up front." House Economic Infrastructure Subcommittee, Mar. 25, 2025, The Florida Channel, at ~16:00.

[3] The Florida Legislature, Econographic News (2024) (reporting 224,403 resident live births in Florida in 2022); NRP, Health News Florida (reporting 44,206 abortions in Florida in 2025); Sarah E. Forrest, *et al*, Trends in risk of pregnancy loss among U.S. women by metropolitan status, 2000–2018, Paediatr. Perinat. Epidemiol. (2025) (reporting that about 20% of pregnancies end in spontaneous loss).

regulated and reserved for people with disabilities as required by federal law. Instead, Florida is flouting federal law by giving thousands of one-year disability parking permits to people based on pregnancy rather than disability. Floridians with disabilities already have difficulty finding accessible parking. The new law is making it concretely harder for Floridians with disabilities to access accessible disability parking spaces in their communities. They are experiencing increased delay, inconvenience, isolation, frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms.

b. Organizations including Plaintiff United Spinal are also harmed. United Spinal's members include thousands of people with disabilities who are being harmed and face a likelihood of future harm because of the new law. United Spinal's resources have been diverted to and wasted on responding to problems and concerns raised by the new Florida law.

c. Businesses like Laura J. Artistry owned by Plaintiff Laura Abbott are also harmed. Businesses with parking can no longer ensure that their accessible disability parking spaces are reserved for their disabled customers as required by federal law. State law now directs that they

offer these spaces to people with Expectant Mother Parking Permits. A business owner cannot follow both laws at once. Business owners who want to reserve safe accessible parking for their disabled customers – as intended by federal law – are harmed.

25) Section 320.0849 is not necessary to solve the problem it identifies:

    a. A pregnant Floridian can get a disability parking permit if they are legally blind or have a mobility disability. The disability can be related to their pregnancy or not. For example, a pregnant woman may have sciatica due to her pregnancy and be unable to walk very far. She can get a temporary disability parking permit lasting up to six months under Florida law. Fla. Stat. Ann. § 320.0848.

    b. The State of Florida can pass a law encouraging or requiring parking areas to have designated spaces for pregnancy. But to comply with federal law, the designated pregnancy spaces must be _new_ designated parking spaces. Florida cannot not take away parking spaces reserved for disabled people under federal law and give those spaces to nondisabled people.

    c. Many Florida businesses already offer parking spaces designated for pregnancy. Sometimes these parking spaces are also for families with small children. These businesses offer disability parking spaces _plus_

pregnancy / family parking spaces. They do not take parking spaces away from disabled people.

**Effects of Section 320.0849 on Plaintiff United Spinal**

26) Plaintiff United Spinal is a national 501(c)(3) nonprofit membership organization that was founded by paralyzed veterans in 1946. United Spinal is run by a Board of Directors, the majority of whom are people with disabilities, and staff that include people with spinal cord injuries.  United Spinal is dedicated to empowering and advocating for people living with spinal cord injuries and disorders ("SCI/D") and all wheelchair users, including veterans, to obtain greater independence and quality of life.

27) United Spinal's vision is "[a] world where people with SCI/D and all wheelchair users can realize their full potential and live life at its fullest," and its mission is to "[e]mpower and advocate for people with SCI/D and all wheelchair users to achieve their highest quality of life." https://unitedspinal.org/our-story/. It uses four pillars or strategies to realize its vision and fulfill its mission: community member empowerment (facilitating healthy and fulfilling lives for our members and all people with disabilities); accessibility (making tomorrow's world accessible for individuals with SCI/D and all wheelchair users); public narrative (disrupting the stigma around disability to trigger full inclusion and participation in public life of our

11

members); and public policy and advocacy (advocating for public policies that ensure equal rights and opportunities for people with disabilities). *Id.* Core activities of United Spinal are described in its annual report. https://unitedspinal.org/pdf/annual_report.pdf.

28) United Spinal provides services and supports to its members with SCI/D, including:

   a. A Resource Center that connects people with SCI/D with personal guidance and state and local resources to help regain their quality of life and independence;

   b. Peer support for wheelchair users, friends, caregivers and family members through a national network of peer support groups, and one-on-one peer mentoring for people with SCI/D;

   c. An online magazine that provides the latest news and resources on active living for wheelchair users, and a library of free disability publications related to SCI/D;

   d. A Pathways to Employment (PTE) program that supports wheelchair users in pursuing job opportunities;

   e. The VetsFirst program that assists veterans and their eligible family members in obtaining the benefits to which they are entitled; and

12

  f. A network of United Spinal chapters that support the SCI/D community in specified geographic areas.

*Impact on United Spinal Members*

29) United Spinal has approximately 70,000 members nationally, most of whom have disabilities. Twenty percent of members nationwide use a wheelchair. United Spinal has more than 3,700 members in Florida served by two United Spinal chapters. Of these members, 66% (2,460) have a disability, 40% (1,501) have a spinal cord injury or disorder, and 25% (928) use a wheelchair. Thousands of United Spinal members in Florida rely on disability parking permits to access parking and participate in community life. Hundreds of disabled United Spinal members who live outside of Florida use their home-state disability parking permits when they travel to Florida.

30) United Spinal members with disabilities who live in Florida already struggle to find accessible parking in their communities. They must search for accessible parking over extended periods of time. They are forced to park farther away from their destination than is safe and accessible for them. Often these members give up on finding parking and go home. Most have decided to forego a trip altogether because they worried they could not find accessible parking. These experiences undermine independence, quality of life, and community integration.

31) Against this background, United Spinal members have been injured by Defendants' unlawful actions and omissions and face a likelihood of future injuries. Defendants' issuance of one-year Expectant Mother Parking Permits to thousands of Floridians – many of whom are not disabled – are causing and are likely to cause United Spinal members additional delay, inconvenience, isolation, frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms.

32) For example, Plaintiff Harrison, a United Spinal member who lives in Florida, drives and parks nearly every day. She needs a van-accessible parking space – or an adjacent accessible space sharing the van space's wide access aisle – to get enough clearance to remove her wheelchair and transfer into it. In late December 2025, she visited the St. Johns County Ocean Pier and Courts Park with her husband, which she visits about six times a month. There were six accessible disability parking spaces, including one van-accessible space. Only one accessible parking space was unoccupied, and both the van-accessible space and the space next to it (sharing the wide access aisle) were taken. As a result, Ms. Harrison had to unload her wheelchair and transfer in the driving lane – a dangerous and inconvenient maneuver – before her husband parked the car.

33) Plaintiff Harrison saw the woman parked in the van space removing her infant from a vehicle displaying a red placard. (Florida parking permits for temporary disability and for Expectant Mothers are red.) Ms. Harrison approached the woman, who had no apparent mobility or visual impairment,[4] to ask about the permit. The woman told Ms. Harrison that it was a pregnancy permit, and that she had given birth just after Thanksgiving. Plaintiff Harrison took a picture of the permit which shows an expiration date of July 2026, meaning it was issued in June of 2025.

34) In the logical course of probable events, Ms. Harrison is likely to experience again concrete injury caused nondisabled people using Expectant Mother Parking Permits. She is likely to again encounter this woman or another person with a pregnancy permit while seeking parking at St. Johns County Ocean Pier and Courts Park, in or around St. Augustine, and in or around St. Johns County. She is likely to have to search longer for parking, park farther away, exit into the driving lane (if someone else is with her), or abandon her trip.

35) As another example, Plaintiff Gitchell, a United Spinal member who lives in Florida, drives and parks several times a week. She requires a designated

---

[4] Many people with less apparent mobility and vision disabilities meet the criteria for a disability parking permit.

disability parking space. In September 2025, her daughter-in-law drove her to Hanger Clinic in Trinity, Florida, which she visits several times a year. Hanger Clinic has one accessible disability parking space.

36) When they arrived, a woman with a red placard was parked in the disability parking space. Ms. Gitchell, a retired nurse practitioner, noticed the woman was pregnant. The woman had no apparent disabilities. Because the woman had taken the only disability parking space, Ms. Gitchell was forced to transfer into her wheelchair in the driving lane and wait on the sidewalk in the heat while her daughter-in-law went to find parking.

37) In the logical course of probable events, Ms. Gitchell is likely to experience again concrete injury caused by nondisabled people using Expectant Mother Parking Permits. She is likely to again encounter this woman or another person with a pregnancy permit while seeking parking at the Hanger Clinic and in or around Pasco County. She is likely to have to search longer for parking, exit into the driving lane, or wait outside in the elements.

38) United Spinal's members with disabilities have experienced similar injuries and are likely to experience such injuries in the future.

*Impact on United Spinal Itself*

39) United Spinal has long defended and sought to expand and strengthen the requirement that parking areas include accessible parking spaces for people

with disabilities, a requirement protected by the ADA and other federal laws. United Spinal's members and constituents need accessible disability parking to participate in employment, education, and community life. Section 320.0849 is causing concrete injury to these members and constituents by decreasing and blocking access to this federally protected parking throughout Florida. As a result of the enactment and implementation of Section 320.0849, United Spinal has been forced to divert its scarce resources to defend the rights and needs of its members and constituents and to protect them from unlawful injury.

40) Since the law's enactment, and on an ongoing basis, United Spinal staff are spending and will continue to spend substantial time responding to problems caused by Section 320.0849. United Spinal staff, including those with the Resource Center, are responding to emails and phone calls from members and constituents in and outside[5] of Florida with concerns about the new law and its impact on their rights under the ADA and other federal laws. These communications include reports of how the pregnancy permits are interfering with the ability of members and constituents to park in accessible spaces in

---

[5] After publicity about the new law spread, several bills were introduced or considered in several states, including Ohio, South Carolina, Tennessee, and Utah, that also purported to allow people with pregnancy permits to park in accessible parking spaces reserved for people with disabilities.

Florida. United Spinal is holding meetings with concerned members to discuss the new law and its implications for members. Regular meetings staffed by United Spinal and held to advance disability supports unrelated to accessible parking have been sidetracked by the need to respond to problems caused by Section 320.0849. Staff have been actively monitoring and investigating the implementation and effects of the new law, including negative changes in the parking experiences of its Florida members. Staff have been urging the Florida Legislature to repeal Section 320.0849.

41) These unplanned activities[6] have been time-consuming and disruptive for United Spinal and have frustrated its mission. United Spinal has had to divert considerable staff time and organizational resources to issues raised by the new law, rather than to continue its work to empower and advocate for people living with spinal cord injuries and disorders and all wheelchair users. For example, an accessible parking working group can no longer work on strengthening disability parking requirements (such as raising the federal scoping requirement to meet current need); instead, it is now responding to Defendant FLHSMV degrading and diminishing the use of accessible

---

[6] The enactment of Section 320.0849 was unanticipated to United Spinal, its Florida members, and additional disabled people in Florida. The Florida legislature did not consult with any disability organizations in enacting the law. One United Spinal staff member described the law as a "curve ball" thrown "out of left field."

18

disability parking spaces below federal minimums for people with disabilities. For further example, one staff member has been unable to work on several priority issues for members, including care support and wheelchair repair, because he has had to divert a significant amount of his time and resources responding to emails and phone calls from members and constituents both in and outside of Florida with complaints and problems caused by Section 320.0849.

42) This diversion of scarce resources has interrupted and prevented the continuation of United Spinal's usual activities. It has delayed staff responses to members and has postponed staff work on other issues. United Spinal anticipates such diversion of resources will continue as long as Section 320.0849 is in place and Defendant FLHSMV continues to issue Expectant Mother Parking Permits.

**Effects of Section 320.0849 on Plaintiff Keller**

43) Plaintiff, Faith Olivia Keller, is a resident of Florida who lives in Leon County with her husband. She is forty-nine years old and was born with upper bilateral amelia, scoliosis, and a right leg length discrepancy.

44) Throughout her childhood, Ms. Keller spent considerable time at Shriner's Hospital undergoing surgeries and treatments to address her physical disabilities. She experienced significant nerve damage since a 1999 knee

replacement, which resulted in loss of function in her right foot. These complications led to her current use of a power wheelchair and a modified minivan with a right-side ramp for mobility. Since 2000, she has relied on this vehicle to maintain her independence and participate in daily activities.

45) Because she is missing her arms and has reduced skin surface area, Ms. Keller is at an increased risk of overheating, especially during peak parking times in the Summer. Proximity to building entrances is also vital in inclement weather, as she cannot hold an umbrella and is more susceptible to illness due to a compromised immune system. Rain exposure can irreparably damage her power wheelchair, and replacement through Florida's Vocational Rehabilitation program is only available every five years, leaving her vulnerable to significant costs and potential isolation.

46) Ms. Keller can only park in van-accessible disability parking spaces with wide access aisles, as other accessible disability parking spaces do not provide the clearance she needs to deploy her ramp and enter or exit her vehicle. She finds that parking in any other type of space is impossible due to her mobility equipment and needs.

47) If Ms. Keller cannot park in a van-accessible disability parking space, she is unable to exit her vehicle, preventing her from attending work functions, medical appointments, and other necessary activities. This limitation affects

her ability to shop for necessities, participate in social events, and engage with the community. The constant uncertainty and extra planning required for parking have a detrimental impact on her physical, mental, and emotional well-being.

48) Before the new law that allows anyone who is pregnant to get an Expectant Mother Parking Permit that lasts one year, Ms. Keller already faced significant challenges securing accessible parking. The limited number of suitable spaces required her to devote additional time to finding parking and often led to anxiety about her ability to keep appointments. For example, when working near the state Capitol, she often had to arrive two to three hours early, despite living less than three miles away, and sometimes circled the complex for over thirty minutes to locate an available van-accessible disability parking space.

49) Against this background, Plaintiff Keller has been injured by Defendants' unlawful actions and omissions and is likely to experience future injuries. Defendants' issuance of one-year Expectant Mother Parking Permits to thousands of Floridians – many of whom are not disabled – are reducing the availability of van-accessible disabled parking. Ms. Keller has seen a parked car with an Expectant Mother Parking Permit at her doctor's office. In the logical course of probable events, Ms. Keller will face additional concrete barriers, traceable to Defendants, while looking for accessible parking.

21

50) Ms. Keller seeks reasonable modification to the Defendants' system of disability parking permits. People with Expectant Mother Parking Permits should be permitted to park only in parking spaces designated specifically for pregnancy, and not in accessible disability parking spaces reserved for people with disabilities and regulated by the ADA.

51) Defendants' unlawful actions and omissions are causing and likely to cause Plaintiff Keller additional delay, inconvenience, isolation, frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms. These injuries limit Ms. Keller's ability to participate in work, social, health, and community activities, diminish her quality of life, and threaten her independence.

**Effects of Section 320.0849 on Plaintiff Harrison**

52) Plaintiff, Kimberly Sue Harrison, is a resident of Florida who lives in St. Johns County with her husband. She is sixty-six years old. In 2004, she was diagnosed with Transverse Myelitis, a neurological disorder which causes spinal-cord inflammation and results in nerve damage. As a result, Ms. Harrison's right leg is 100% paralyzed, and her left leg is 85% paralyzed. She also experiences nerve pain, and the lesions on her spine affect her body temperature regulation.

53) Ms. Harrison uses a manual rigid wheelchair. She drives a minivan with the back passenger seats removed. When traveling, she stores her wheelchair behind the driver's seat where the back passenger seats would be.

54) Ms. Harrison can only park in van-accessible disability parking spaces or an accessible disability parking space adjacent to a van space (with a wider access aisle) as other spaces do not provide the clearance she needs to unload her wheelchair and transfer. When parking, Ms. Harrison must open her door to its full extent, stand on her left leg, open the minivan's back sliding door, unload her wheelchair, and transfer. Ms. Harrison often drives herself, though her husband may also drive while she rides in the passenger seat. Whether she is the driver or the passenger, her process for unloading and transferring is the same. She relies on this vehicle to maintain her independence and participate in daily activities. She finds that parking in any space other than a van-accessible space is impossible due to her mobility equipment and needs.

55) Because Ms. Harrison cannot walk, proximity to building entrances is vital for her safety and well-being. Using her wheelchair, she is lower to the ground, putting her at increased risk of being injured by drivers when traveling through the driving lanes of a parking lot. Because she must watch for cars, she cannot devote her attention to navigating cracks and erosions in the pavement. Ms. Harrison is also concerned about getting caught in inclement

weather. The lesions on Ms. Harrison's spine affect her body temperature regulation, and she is very concerned about overheating as it is difficult for her body to cool down.

56) Before the new law that allows anyone who is pregnant to get an Expectant Mother Parking Permit that lasts one year, Ms. Harrison already faced significant challenges securing accessible parking. The limited number of suitable spaces required her to devote additional time to finding parking. When planning outings, Ms. Harrison always allots extra time to find parking. When Ms. Harrison cannot find parking, she waits and circles the parking lot, finds parking further away, or abandons her visit. In one instance, Ms. Harrison and her husband went to the airport and allotted an extra hour just to find parking. However, there was no accessible disability parking available. Her husband had to drop her off at the curb and find a regular parking space. If Ms. Harrison had driven herself, she would have missed her flight. As a result of her experiences, Ms. Harrison experiences anxiety about finding parking.

57) If Ms. Harrison cannot park in a van-accessible disability parking space or an accessible space sharing a wide access aisle with a van space, she is unable to exit her vehicle, preventing her from attending work functions, medical appointments, and other necessary activities. This limitation affects her ability

24

to shop for necessities, participate in social events, and engage with the community. The constant uncertainty and extra planning required for parking have a detrimental impact on her physical, mental, and emotional well-being.

58) Against this background, Plaintiff Harrison has been injured by Defendants' unlawful actions and omissions and is likely to experience future injuries. Defendants' issuance of one-year Expectant Mother Parking Permits to thousands of Floridians – many of whom are not disabled – are causing and are likely to cause Plaintiff Harrison additional delay, inconvenience, isolation, frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms. Defendants' actions and omissions are reducing the availability of van-accessible disability parking spaces and adjacent spaces sharing the wide access aisle, making it likely Ms. Harrison will face additional barriers when looking for accessible parking.

59) In late December 2025, Ms. Harrison visited St. Johns County Ocean Pier and Courts Park, sometimes called St. Augustine Beach Pier Park, with her husband and friend. Her husband was driving and Ms. Harrison was in the front passenger seat. They pulled into the St. Johns County Ocean Pier and Courts Park parking lot to park.

60) In the area of the parking lot Ms. Harrison wanted to park in, there were six parking spaces designated as accessible, including one van-accessible space

and an adjacent space sharing the wide access aisle. When Ms. Harrison arrived, the van-accessible space was occupied by a Toyota and the adjacent space was occupied by another car. The only accessible disability space available was a space without a wide access aisle and with cars parked on either side.

61) If Ms. Harrison had driven herself, she would not have been able to park in the remaining accessible disability parking space (without a wide access aisle) because she would have been unable to unload her wheelchair and transfer. She would have had to search for parking further away, or she would have had to abandon her visit and go home.

62) On this occasion, Ms. Harrison's husband was driving, and he stopped the car in the driving lane of the parking lot. Ms. Harrison unloaded her wheelchair and transferred into it using the method described above. Ms. Harrison waited in the driving lane of the parking lot – an uncomfortable, frustrating, and unsafe situation – while her husband pulled the car into the remaining accessible disability space.

63) Ms. Harrison observed a woman exit the Toyota and remove an infant from the vehicle. The woman had no apparent mobility or vision impairments.[7] Ms.

---

[7] *See* n. 3.

Harrison observed a red temporary disability parking placard hanging from the Toyota's rearview mirror. The parking placard's expiration date was July 2026. Ms. Harrison took a picture of the placard.

64) Ms. Harrison asked the woman if the placard was "one of the new pregnant mothers permits?" The woman said it was. The woman told Ms. Harrison that her doctor "offered" the permit to her "months ago," printed off the form, and signed it. The woman told Ms. Harrison that she had given birth in November 2025, just after Thanksgiving, and she was no longer pregnant.

65) Because the woman had been issued an Expectant Mother Parking Permit by Defendant, she was allowed under Florida law to park in the only van-accessible disability parking space available. Because the woman was parked in the van-accessible space, the only remaining disability parking space was one without an adequate access aisle for Ms. Harrison and she was forced to unload and transfer in the driving lane of the parking lot. This unsafe and inconvenient outcome denied Ms. Harrison the ability to fully and equally participate in parking at St. Johns County Ocean Pier and Courts Park.

66) Ms. Harrison visits St. Johns County Ocean Pier and Courts Park about six times a month, including every Wednesday for the Pier Farmer's Market which runs year-round. Ms. Harrison intends to continue visiting St. Johns County Ocean Pier and Courts Park about six times a month, including every

Wednesday. When Ms. Harrison visits St. Johns County Ocean Pier and Courts Park, she parks in the St. Johns County Ocean Pier and Courts Park parking lot. Given the logical course of probable events, Ms. Harrison is likely to again encounter this woman or another Expectant Mother Parking Permit holder at St. Johns County Ocean Pier and Courts Park, in or around St. Augustine, and in or around St. Johns County. She is likely to have to exit into the driving lane (if someone else is with her), search longer for parking, park farther away, or abandon her trip.

67) Ms. Harrison seeks reasonable modification to the Defendants' system of disability parking permits. People with Expectant Mother Parking Permits should be permitted to park only in parking spaces designated specifically for pregnancy, and not in accessible disability parking spaces reserved for people with disabilities and regulated by the ADA.

68) Defendants' unlawful actions and omissions are causing and likely to cause Plaintiff Harrison additional delay, inconvenience, isolation, frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms. These injuries limit Ms. Harrison's ability to participate in work, social, health, and community activities, diminish her quality of life, and threaten her independence.

**Effects of Section 320.0849 on Plaintiff Gitchell**

28

69) Plaintiff, Linda Gitchell, is a resident of Florida who lives in Pasco County. She is 71 years old. Ms. Gitchell is a retired nurse practitioner.

70) In December 2021, Ms. Gitchell went into septic shock. Due to complications following several treatments and surgeries, she developed gangrene in her legs. As a result, in February 2022, she had both of her legs amputated. She now wears prosthetics and uses a walker, a manual wheelchair, and a power wheelchair to ambulate.

71) Ms. Gitchell lives with her son and daughter-in-law. Her daughter-in-law drives her. When traveling by car, Ms. Gitchell brings her walker and manual wheelchair. When exiting the vehicle, Ms. Gitchell's daughter-in-law will set up her walker in front of the door, and wheelchair beside it. Ms. Gitchell first transfers to the walker and then to the wheelchair. Due to her mobility impairments and the space she needs to transfer, Ms. Gitchell requires a designated accessible parking space.

72) Because of Ms. Gitchell's mobility impairments, proximity to building entrances is vital for her safety and well-being. Though Ms. Gitchell can walk short distances with her walker, she prefers to use her wheelchair. She has found that parking lot asphalt is often cracked and uneven, making it difficult and dangerous to travel over. Using her wheelchair, she is lower to the ground, putting her at increased risk of being injured by drivers when traveling

29

through the parking lot. Ms. Gitchell is also concerned about traveling through the parking lot in inclement weather.

73) Before the new law that allows anyone who is pregnant to get an Expectant Mother Parking Permit that lasts one year, Ms. Gitchell already faced significant challenges securing accessible parking. The limited number of disability parking spaces required her to devote additional time to finding parking. When planning outings, Ms. Gitchell always allots extra time to find parking. For instance, when visiting popular locations such as Costco or Trader Joe's, Ms. Gitchell will arrive at least thirty minutes before the store opens just to get a parking space. Even still, finding disability parking is a challenge most of the time. When Ms. Gitchell cannot find parking, she waits and circles the parking lot, or her daughter-in-law will unload her and go find parking while Ms. Gitchell waits. The constant uncertainty and extra planning required for parking have a detrimental impact on her physical, mental, and emotional well-being.

74) Against this background, Plaintiff Gitchell has been injured by Defendants' unlawful actions and omissions and is likely to experience future injuries. Defendants' issuance of one-year Expectant Mother Parking Permits to thousands of Floridians – many of whom are not disabled – are causing and are likely to cause Plaintiff Gitchell additional delay, inconvenience, isolation,

frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms. Defendants' actions and omissions are reducing the availability of disability parking spaces, making it likely Ms. Gitchell will face additional barriers when looking for accessible parking.

75) In September 2025, Ms. Gitchell visited the Hanger Clinic in Trinity, Florida for issues relating to her prosthetics. The Hanger Clinic has one disability parking space. When Ms. Gitchell arrived, a woman with a red placard was parked in the disability parking space. When the woman exited her vehicle, Ms. Gitchell saw that she was pregnant. The woman was wearing a short-sleeve knee-length dress and had no prosthetics or other apparent disabilities.

76) Because the woman had taken the one disability parking space, Ms. Gitchell had to unload and transfer into her wheelchair in the driving lane of the parking lot. Ms. Gitchell's daughter-in-law had to help her onto the sidewalk. Ms. Gitchell then waited for her daughter-in-law to find parking. The temperature at the time was around ninety degrees Fahrenheit.

77) Because the woman had been issued an Expectant Mother Parking Permit by Defendant, she was allowed under Florida law to park in the only disability parking space available. Because the woman was parked in the disability space, Ms. Gitchell could not access parking, was forced to unload into the driving lane, and was forced to wait outside in high temperatures. This unsafe

31

and inconvenient outcome denied Ms. Gitchell the ability to fully and equally participate in parking at the Hanger Clinic.

78) Ms. Gitchell visits and parks at the Hanger Clinic several times a year. Ms. Gitchell has upcoming appointments at the Hanger Clinic and will continue to visit for the foreseeable future. In the logical course of probable events, Ms. Gitchell is likely to again encounter this woman or another Expectant Mother Parking Permit holder at the Hangar Clinic and in or around Pasco County. She is likely to have to exit into the driving lane, search longer for parking, or wait outside in the elements.

79) Ms. Gitchell goes to appointments at the West Coast Infectious Diseases in New Port Richey, Florida. Immediately next to West Coast Infectious Diseases is an Obstetrician-gynecologist office. The two offices are served by two disability parking spaces. On two occasions, Ms. Gitchell has seen these spaces occupied by vehicles with red placards. Ms. Gitchell reasonably believes that she has seen and will continue to see the negative impact of the new law on disability parking spaces that she needs to use.

80) Ms. Gitchell seeks reasonable modification to the Defendants' system of disability parking permits. People with Expectant Mother Parking Permits should be permitted to park only in parking spaces designated specifically for

32

pregnancy, and not in accessible disability parking spaces reserved for people with disabilities and regulated by the ADA.

81) Defendants' unlawful actions and omissions are causing and likely to cause Plaintiff Gitchell additional delay, inconvenience, isolation, frustration, anxiety, embarrassment, wasted time, disappointment, and feelings of exclusion, among other harms. These injuries limit Ms. Gitchell's ability to participate in work, social, health, and community activities, diminish her quality of life, and threaten her independence.

### Effects of Section 320.0849 on Plaintiff Abbott

82) Plaintiff Laura Abbott is a resident of Florida who lives in Leon County and owns and operates Laura J. Artistry. She is forty-two years old and has been a licensed cosmetologist for 16 years. Laura J. Artistry is located in Tallahassee, Florida. Ms. Abbott has operated her own business since June 2014.

83) Prior to Ms. Abbott's current location, she leased space for five years until the building was sold. When Ms. Abbott was looking for a new location, she specifically looked for places that were accessible for her disabled clients such as a location with no stairs, accessible entrances and a disability parking space. Ms. Abbott inquired about several locations and looked at three locations until she was able to find a building that met all of her accessibility

33

requirements. Ms. Abbott has operated Laura J. Artistry in her current Tallahassee building since October 2025.

84) At Ms. Abbott's current location, there is one van-accessible disability parking space in front of her salon. If the disability parking space is taken, her clients are forced to use the non-disability parking spaces in the parking lot. However, some of these parking spaces are located on an incline which makes it difficult, if not impossible, for her disabled clients to access her salon. One of Ms. Abbott's clients can only park in the van-accessible disability parking space in front of the salon because it has an access aisle that provides the client with enough clearance to deploy her ramp and enter or exit her vehicle. If the van-accessible disability parking space is taken, her client is unable to access the salon for her appointment.

85) Ms. Abbott has at least three clients whom she regularly sees, and other clients whom she occasionally sees, who require accessible disability parking spaces in order to access Laura J. Artistry. In addition, Ms. Abbott has many older clients who may need an accessible disability parking space in the future. Based on what she hears from her older and disabled client, Ms. Abbott understands that there are many businesses that are inaccessible to people with disabilities. It is very important to Ms. Abbott that her clients with disabilities have safe parking to be able to access Laura J. Artistry.

86) As a business owner, Ms. Abbott knows she cannot follow both the federal law and Florida's law at the same time. Ms. Abbott knows that offering accessible disability parking to pregnant women violates federal law. At the same time, Ms. Abbott cannot reserve the disability parking space for people with disabilities – as she wants to do – as this would violate Florida law.

87) As a result of Defendants' unlawful actions and omissions, Ms. Abbott can no longer assure her clients with disabilities and potential clients with disabilities that the parking area just outside her entrance includes a van-accessible disability parking space reserved for people with disabilities.

## COUNT I – VIOLATION OF

## THE AMERICANS WITH DISABILITIES ACT

### 42 U.S.C. §§ 12132 & 12203(b)

### (against all Defendants)

88) Plaintiffs reallege and incorporate by reference Paragraphs 1 through 87, as if fully set forth herein.

89) Under Title II of the ADA, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

35

90) Unlawful disability discrimination by a public entity under Title II of the ADA includes: denying a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service, whether done directly or through contractual, licensing, or other arrangements, 28 C.F.R. § 35.130(b)(1)(i); utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, 28 C.F.R. § 35.130(b)(3); refusing to make reasonable modifications in policies, practices, or procedures, as needed to ensure that people with disabilities have equal access to programs, 28 C.F.R. § 35.130(b)(7); and discrimination against a person based on their association with people with disabilities. 28 C.F.R. § 35.130(g).

91) The ADA also prohibits interference with the exercise and enjoyment of rights protected by the ADA. 42 U.S.C. § 12203(b).

92) Defendants issue parking permits and regulate the use of designated accessible disability parking spaces in Florida. Defendants provide the service, program, or activity of the use of accessible disability parking spaces in the State of Florida.

93) Since July 1, 2025, FLHSMV has implemented Section 320.0849 and has issued thousands of one-year placards based on pregnancy alone, thereby permitting people without disabilities to use accessible disability parking spaces reserved under federal law for the use of people with disabilities.

94) By permitting people who are not disabled to park in designated accessible disability parking spaces, contrary to federal law, Defendants are: excluding from or otherwise making unavailable to Plaintiffs the use of accessible disability parking spaces; denying Plaintiffs the opportunity to benefit from accessible disability parking spaces; subjecting Plaintiffs to disability discrimination; and substantially impairing the objectives of the disability parking program with respect to Plaintiffs. Defendants are interfering with Plaintiffs' exercise and enjoyment of rights under the ADA.

95) Defendants have not made and are refusing to make obvious reasonable modifications to their disability parking permit program. People with Expectant Mother Parking Permits should be permitted to park only in parking spaces designated specifically for pregnancy, and not in accessible disability parking spaces reserved for people with disabilities and regulated by the ADA.

96) Pursuant to 42 U.S.C. § 12188, this Court is vested with the authority to grant Plaintiffs the injunctive relief requested herein.

## COUNT II – PREEMPTION; EQUITY

### (against all Defendants)

97) Plaintiffs reallege and incorporate by reference Paragraphs 1 through 87, as if fully set forth herein.

98) The Americans with Disabilities Act, as a law of the United States, is the "supreme Law of the Land." U.S. Const. art. VI, cl. 2 (hereinafter "the Supremacy Clause").

99) Section 320.0849 is a state law which provides less protection than the ADA. By permitting people who are not disabled to park in designated disability parking spaces, Section 320.0849 conflicts with the ADA in violation of the Supremacy Clause and is therefore preempted.

100) Where Section 320.0849 conflicts with the ADA by providing less protections, Section 320.0849 is void, and FLHSMV must follow the ADA.

101) FLHSMV has issued and continues to issue thousands of Expectant Mother Parking Permits under Section 320.0849, a preempted law. As such, and for the reasons set forth in Count 1, FLHSMV is in violation of the ADA.

102) Pursuant to 42 U.S.C. § 12188, this Court is vested with the authority to grant Plaintiffs the injunctive relief requested herein.

WHEREFORE, Plaintiffs demand judgment against Defendants and request that this Court:

A.      Declare that Defendants' issuance and enforcement of Expectant Mother Parking Permits violates Title II of the Americans with Disabilities Act;

B.      Enjoin Defendants, their agents, employees, and successors from issuing, distributing, or recognizing placards that purport to authorize non-disabled persons to use accessible disability parking spaces reserved for people with disabilities and regulated by the ADA;

C.      Issue a permanent injunction requiring Defendants, their agents, employees, and successors to (1) rescind and invalidate all currently existing Expectant Mother Parking Permits; and/or (2) take steps to ensure that Expectant Mother Parking Permits only allow permitholders to use parking spaces designated specifically for pregnancy, and not accessible disability parking spaces reserved for people with disabilities and regulated by the ADA;

D.      Order Defendants to adopt and implement policies and training ensuring compliance with 42 U.S.C. § 12132, 28 C.F.R. pt. 35;

E.      Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205;

39

F.      Retain jurisdiction of this case until Defendants have fully complied

with the orders of this Court; and

G.      Grant such other and further relief as this Court deems just and proper.

Dated this 18th Day of June 2026.

Respectfully submitted,

*/s/ Claudia Center*
Claudia Center*
Jinny Kim*
Peter Talkington*
Disability Rights Education
and Defense Fund
3075 Adeline Street, Suite 210
Berkeley, CA 94703
(510) 644-2555
ccenter@dredf.org
jkim@dredf.org
ptalkington@dredf.org

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slate Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, GA 30345
(404) 458-7283
james@slater.legal

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

40